UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. CR 10-01311 MMM |
| Plaintiff, ) | |
| vs. ) | ORDER DENYING MOTION FOR |
| ) | JUDGMENT OF ACQUITTAL |
| JOSE MARIA CORONA-PEREZ ) | |
| Defendant. ) | |

On October 28, 2011, Jose Maria Corona-Perez was convicted of (1) conspiracy to possess with intent to distribute at least 100 kilograms of a mixture and substance containing a detectable amount of marijuana and (2) knowingly and intentionally possessing with intent to distribute at least 100 kilograms of a mixture and substance containing a detectable amount of marijuana.[1] After the verdict was announced, Corona-Perez's trial counsel, G. David Haigh, stated his intent to file a motion for new trial, and the court extended the date by which such a motion had to be filed.[2] On November 16, 2011, Haigh moved to withdraw as counsel, asserting that his client had

---

[1] Verdict Form, Docket No. 382 (Oct. 28, 2011).

[2] Reporter's Transcript of Proceedings, October 28, 2011 ("October 28 Transcript") at 7:4-17.

a possible ineffective assistance of counsel claim, and that it would be a conflict of interest for him to raise such an issue in a motion for new trial.³ The court granted Haigh's motion to withdraw.⁴

On December 23, 2011, Corona-Perez moved for judgment of acquittal or alternatively, for a new trial.⁵ The government opposed the motion.⁶ On April 30, 2012, Corona-Perez

---

³Ex Parte Motion to Be Relieved as Counsel ("Withdrawal"), Docket No. 392 (Nov. 16, 2011).

⁴Order, Docket No. 395 (Nov. 18, 2011).

⁵Motion for New Trial or Judgment of Acquittal ("Motion"), Docket No. 430 (Dec. 23, 2011).

⁶Amended Opposition to Defendant Jose Maria Corona-Perez's Motion for New Trial or a Judgment of Acquittal ("Opposition"), Docket No. 513 (Apr. 5, 2012). The government originally filed its opposition on January 6, 2012. (Opposition to Defendant Jose Maria Corona-Perez's Motion for Judgment of Acquittal ("Original Opposition"), Docket No. 442 (Jan. 6, 2012).) Two days later, the government filed an *ex parte* application requesting that the court find that Corona-Perez had waived the attorney-client privilege with respect to communications with Haigh relevant to his ineffective assistance claim, and proposing a procedure by which the government could obtain the communications. (*Ex Parte* Application Requesting Court Order: (1) Authorizing Disclosure of Certain Attorney Client Communications, (2) Establishing Procedure for Obtaining Such Attorney Client Communications, and (3) Implementing Protective Order for Such Obtained Communications ("Application"), Docket No. 437 (Jan. 4, 2012); see also Defendant Jose Maria Corona-Perez's Opposition to Ex Parte Application for Order Waiving Attorney-Client Privilege ("Application Opposition"), Docket No. 438 (Jan. 5, 2012); Reply to Defendant's Opposition to *Ex Parte* Application ("Application Reply"), Docket No. 439 (Jan. 5, 2012).) The court granted the motion, and permitted the government to file supplemental opposition to Corona-Perez's motion after the communications had been obtained. (Order Granting Plaintiff's Motion for Disclosure of Attorney-Client Communications ("Application Order"), Docket No. 453 (Jan. 11, 2012).) On the government's motion, the court also authorized the disclosure of communications involving a defense investigator for Corona-Perez, Fred Krasco. (Second *Ex Parte* Application Requesting Court Order: (1) Authorizing Disclosure of Certain Attorney Client Communications and Establishing Procedures for Obtaining the Same, and (2) Implementing Protective Order for Such Obtained Communications ("Second Application"), Docket No. 486 (Feb. 21, 2012); Order Sealing Documents ("Second Application Order"), Docket No. 487 (Feb. 21, 2012).) The government filed supplemental opposition on April 5, 2012.

withdrew his motion for new trial, and elected to pursue only a motion for judgment of acquittal.[7]

## I. FACTUAL BACKGROUND

### A. Testimony of Detective Mark Adams

In its case in chief, the government called Detective Mark Adams, a patrol supervisor for the Baldwin Park Police Department.[8] Adams testified that, as part of an investigation undertaken with the Drug Enforcement Administration, he conducted surveillance on a property at 345 Cedar Street, Inglewood, California; this was the residence of Jose Enrique Ulloa.[9] On April 22, 2010, Adams took the "primary eye" – the primary line of sight – outside the residence.[10] At approximately 11:30 a.m., Adams observed two male Hispanics arrive at Ulloa's house in a silver Lexus and go into the garage.[11] Adams recounted that shortly thereafter, Ulloa left the residence in a red Ford F-150; the silver Lexus left as well. Adams followed as the cars drove to the city of Ontario and parked in a Rite Aid parking lot.[12] Adams stated that about ten minutes later, a white PT Cruiser containing two male Hispanics pulled into the parking lot.[13] He testified that the passenger in the PTC Cruiser spoke briefly with Ulloa and the driver of the Lexus, and then got into the driver's seat of the F-150 and drove way. The driver of the PT Cruiser followed.[14] Based on his experience, Adams testified that he believed

---

[7]Defendant Jose Maria Corona-Perez's Notice of Withdrawal of Motion for New Trial ("New Trial Withdrawal"), Docket No. 519 (Apr. 30, 2012).

[8]Reporter's Transcript of Proceedings, October 25, 2011 ("October 25 Transcript"), at 150:2-16.

[9]*Id.* at 155:22-156:5.

[10]*Id.* at 153:14-20, 156:8.

[11]*Id.* at 156:17-157:1.

[12]*Id.* at 157:12-158:2.

[13]*Id.* at 158:4-9.

[14]*Id.* at 158:10-159:2.

3

"the red F-150 was a load vehicle or loaded with some type of illegal drug, and in order to compartmentalize or shield individuals from knowing everything about the narcotics or where they were going or who they were destined to or where they were going to arrive, Ulloa could only bring the vehicle so far, and then someone from the recipient's side of the narcotics deal picked up the vehicle and would drive it to the location or its destination."[15]

Adams followed the F-150 and the PT Cruiser for several miles until the vehicles arrived at Boyd Lumber (now Arrow Truss) in Upland, California.[16] Adams commenced surveillance at the location when he arrived, which he estimated to be approximately 1:30 p.m..[17] Adams was recalled in the government's rebuttal case. After reviewing his investigative notes to refresh his memory, Adams recalled that he observed the vehicles arrive at Boyd Lumber at 1:52 p.m.[18] Adams stated that from his position, he could see the front bay door of the warehouse he was surveilling over a fence that "had vines . . . or some type of bushes growing on it."[19]

Adams testified that shortly after the red F-150 and PT Cruiser reached the location, a gold Volvo that contained two Hispanics arrived. The individuals exited the vehicle and opened the bay door, allowing the red F-150 to back into the warehouse.[20] Adams identified Corona-Perez as the passenger in the Volvo who opened the warehouse door so that the F-150 could enter.[21] He stated that the drivers of the Volvo and PT Cruiser then parked near the warehouse.[22]

---

[15]*Id*. at 159:10-17.

[16]*Id*. at 160:12-15.

[17]*Id*. at 160:16-20.

[18]Reporter's Transcript of Proceedings, October 27, 2011 ("October 27 Transcript") at 35:1-15.

[19]October 25 Transcript at 163:2-5.

[20]*Id*. at 164:13-166:1.

[21]*Id*. at 164:24-165:18.

[22]*Id*. at 166:3-6.

4

Adams recounted that, at approximately 6:30 p.m., the bay door opened, the red F-150 exited, and the driver of the truck spoke briefly with Corona-Perez and the driver of the gold Volvo. At that point, the F-150 and PT Cruiser drove away.[23] Corona-Perez and the driver of the gold Volvo returned to the warehouse, shutting the bay door behind them.[24] Adams said that approximately thirty minutes later, law enforcement raided the warehouse and began searching for the two individuals believed to be inside.[25] Corona-Perez was apprehended inside the warehouse. Thirty vacuum-sealed bales of marijuana were also found in the building.[26] A vacuum sealing machine was also found inside.[27] Adams recognized the individual who was arrested as the same individual he had seen earlier because he was wearing the same clothes – "a checkered shirt or kind of Pendleton type shirt and beige pants."[28] One of the diesel trucks parked near the warehouse was registered to Corona-Perez.[29]

On cross examination, Adams stated that the marijuana was found in a pile of "junk," and that it was not apparent to him upon first entering the warehouse that marijuana was located there.[30] Adams testified that, because of the sealing, the marijuana did not emit a smell.[31]

---

[23]*Id.* at 166:18-167:4.

[24]*Id.* at 167:13-16.

[25]*Id.* at 167:18-169:19.

[26]*Id.* at 170:10-18.

[27]*Id.* at 177:24-179:7.

[28]October 27 Transcript at 36:7-19.

[29]October 25 Transcript at 182:13-23.

[30]*Id.* at 187:3-11.

[31]*Id.* at 194:21-195:8.

5

**B.     Testimony of Special Agent Melissa Schneider**

The government next called Melissa Schneider, a special agent with the DEA.[32] Schneider testified that, as part of the investigation that resulted in Corona-Perez's arrest, agents intercepted calls over the telephone of a target named Jose Martin Torres. The DEA had identified Torres as a large scale drug trafficker responsible for the importation of large quantities of marijuana and cocaine from Mexico.[33] Schneider stated that, based on intercepted calls between Torres and Ulloa, she concluded that Ulloa was storing a drug shipment at his house, and ordered a team to establish surveillance.[34] She confirmed Adams' testimony that law enforcement officers followed the red F-150 truck from Ulloa's residence and that, upon arriving at the warehouse in Upland, Adams "set up the eye or a direct visual onto the warehouse and reported the activity that he observed at the warehouse."[35] Schneider stated that, at 6:00 p.m. or 6:30 p.m., she and the other law enforcement officers secured the warehouse, and found both the marijuana and Corona-Perez.[36] Schneider acknowledged that Corona-Perez had not been identified as a participant on any of the intercepted calls, and that he was not a suspect in the case until he was observed on April 22, 2010.[37]

**C.     Testimony of Special Agent Brian Rose**

The government also called Brian Rose, a special agent with the California Department of Justice Bureau of Narcotics Enforcement.[38] Ross testified that when drugs are transferred from

---

[32]Reporter's Transcript of Proceedings, October 26, 2011 ("October 26, Transcript"), at 25:4-11.

[33]*Id.* at 34:2-14.

[34]*Id.* at 37:6-47:17,

[35]*Id.* at 56:2-58:1.

[36]*Id.* at 58:6-60:24.

[37]*Id.* at 69:21-70:14.

[38]*Id.* at 91:4-13.

one criminal organization to another, participants frequently meet at a neutral location and switch drivers, so that the organization receiving the narcotics can keep the new location of the drugs secret.[39] Ross opined that the conduct of the individuals surveilled in this case was consistent with this type of vehicle switch.[40] He noted that drug organizations typically will not allow an individual who is not affiliated with the organization to be present at a location where narcotics are stored.[41] As he explained:

> "Your drug trafficking organizations, again, they are protecting a significant investment. In this case it's a quarter million dollars. One of the ways to prevent loss of that investment is to keep people that you don't know or that you don't affiliate with or that is from a separate organization, you keep them out of the location. They don't even know where your stash location is. And again, this goes back to compartmentalizing. People that are within the organization that are involved in the transactions are typically the only people you have inside your warehouse. And there's a couple of reasons. If you don't know the person, there's a potential they are an informant. If you don't know the person, there's the potential that they work for the other organization. If you don't know the person, there's a potential they are just an average citizen who is not going to be pleased that they are inside a house or warehousing location with a bunch of drugs, and they may notify the police."[42]

### D. Testimony of Corona-Perez

After the government rested, the defense called Corona-Perez.[43] He testified that he was

---

[39]*Id.* at 107:20-108:16.

[40]*Id.* at 108:21-109:5.

[41]*Id.* at 115:11-24.

[42]*Id.* at 115:24-116:17.

[43]*Id.* at 136:1-5.

7

a truck driver prior to his arrest, and had an agreement with Arrow Truss that permitted him to park his truck on the company's property.[44] He stated that he had also been working as a subcontractor for Arrow Truss for about five years.[45]

Corona-Perez testified that, on April 22, 2010, he was picked up at his home by Adolfo Aguirre, the owner of Arrow Truss, and driven to the company.[46] His first job of the day involved taking trusses to Montclair, California.[47] He stated that he started that job at 6:30 a.m. and traveled to 5635 Benito Street in Montclair.[48] Corona-Perez recounted that the crane he needed to unload his truck did not arrive at the location until approximately 7:30 a.m, and that it took two or two and a half hours to complete the unloading.[49] He said he returned to Arrow Truss at 10:00 or 10:30 a.m. and began loading his flatbed for a second trip; he got the truck loaded by 11:00 or 11:30 a.m.,[50] and drove to Newport Beach, where he unloaded trusses. He testified that he left the second job site at 1:30 or 2:00 p.m.,[51] and arrived back at Arrow Truss at 3:00 or 3:30 p.m.[52]

Once there, Corona-Perez stated, he got a mud flap from Aguirre, because one was missing from his trailer. He also washed the trailer, since he was scheduled to transport produce the following day.[53] Corona-Perez testified that at approximately 5:00 p.m., he entered the warehouse

---

[44]*Id.* at 137:6-139:17.

[45]*Id.* at 154:22-155:4.

[46]*Id.* at 145:15-23.

[47]*Id.* at 144:15-18.

[48]*Id.* at 145:24-146:4.

[49]*Id.* at 146:22-147:5.

[50]*Id.* at 149:10-19.

[51]*Id.* at 149:22-152:25.

[52]*Id.* at 153:3-7.

[53]*Id.* at 156:2-257:7.

8

to have a beer with Jorge Moreno, the owner of a "sand-colored Volvo."[54] Corona-Perez said that he was waiting for either his wife or his brother-in-law to pick him up.[55] He recounted that while he was in the warehouse, Moreno suddenly announced that the police were coming, and both men fled into a different part of the warehouse. Corona-Perez was subsequently found in that part of the warehouse and arrested.[56] He stated that he did not see a red F-150 truck and that he did not move any packages while in the warehouse.[57]

## II. DISCUSSION

### A. Corona-Perez's Motion for Judgment of Acquittal Pursuant to Rule 29

While Corona-Perez devoted a majority of his pleading to the motion for new trial he has now withdrawn, he did offer some argument regarding the motion for judgment of acquittal.[58] Corona-Perez moved for a judgment of acquittal at the close of the government's case; the motion was denied.[59] His renewed motion is based on largely the same arguments he advanced at that time. Corona-Perez asserts that the marijuana found in the warehouse was well hidden, that he was not heard on any intercepted telephone calls, that he was not an original target of the drug investigation, and that only one officer observed him actively interacting with the suspected drug dealer.[60] Even that officer, Corona-Perez contends, did not see him engage in any obviously illegal conduct; rather, he saw only that Corona-Perez opened the warehouse door.[61]

---

[54] *Id.* at 157:11-158:6.

[55] *Id.* at 165:12-166:8.

[56] *Id.* at 166:21-167:22.

[57] *Id.* at 168:2-7.

[58] Motion at 24-25.

[59] October 26 Transcript at 183:10-186:16.

[60] Motion at 25.

[61] *Id.*

9

Under Rule 29 of the Federal Rules of Criminal Procedure, the court must enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction." FED.R.CRIM.PROC. 29(a). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." FED.R.CRIM.PROC. 29(a)(1).[62] Entry of a judgment of acquittal is proper only if the court concludes, after viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences in the government's favor, that no reasonable juror could have found the defendant guilty of the crime charged beyond a reasonable doubt. *United States v. Leos-Maldonado*, 302 F.3d 1061 (9th Cir. 2002); *United States v. Williams*, 547 F.3d 1187, 1195 n. 6 (9th Cir. 2008).

In the court's view, the government adduced sufficient evidence that the jury could have found Coron-Perez guilty beyond a reasonable doubt. It is undisputed that Corona-Perez was found in a warehouse containing a large amount of marijuana, and that Corona-Perez fled into a different part of the warehouse upon being alerted that the police had arrived.[63] Although Corona-Perez offered an innocent explanation for his presence at the warehouse, the jury could rationally have concluded that the explanation was not plausible, and that a criminal organization was unlikely to permit an individual who was not associated with the enterprise to socialize in an area containing a large quantity of narcotics.[64] Based on Adams' testimony, moreover, the jury could have found that Corona-Perez was in the warehouse hours earlier than he indicated, and that he communicated with other individuals involved in the scheme and actively assisted the driver of a truck containing narcotics to enter the warehouse.[65] While the defense questioned Adams' ability

---

[62]Corona-Perez sought additional time to file the motion, and the court continued the deadline for filing a motion for judgment of acquittal and motion for new trial to December 23, 2011. (Order on Unopposed *Ex Parte* Application for Leave to File New Trial Motion and Setting of Briefing Scheduling ("Order Extending Deadline"), Docket No. 423 (Dec. 15, 2011).) Corona-Perez complied with the extended deadline.

[63]October 26 Transcript at 166:21-167:22.

[64]*Id*. at 115:11-116:17.

[65]October 25 Transcript at 164:24-165:18.

to recognize Corona-Perez during his surveillance, Adams plausibly explained how he recognized the individual who was arrested as the one he had seen communicating with the driver of the F-150 truck and opening the warehouse door so the F-150 could enter.  Adams said he recognized Corona-Perez because he was wearing the same clothes on both occasions.[66]  While Corona-Perez asserted that he was still out making deliveries at the time Adams purportedly first observed him, reasonable jurors could have disbelieved him and found Adams' account more credible.

Consequently, a reasonable jury could have concluded at the close of the evidence that Corona-Perez was guilty of conspiracy to possess with intent to distribute marijuana and of knowingly and intentionally possessing marijuana with intent to distribute.  The motion for judgment of acquittal must be denied.

### III.  CONCLUSION

For the reasons stated, Corona-Perez's motion for judgment of acquittal is denied.

DATED: May 8, 2012

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[66]October 27 Transcript at 36:7-19.

11